UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

WANDA GOODPASTER, et al.,           )
        Plaintiffs,                )
                             )
    vs.                                )          1:12-cv-669-RLY-DML
                             )
CITY OF INDIANAPOLIS, COUNTY OF  )
MARION, MAYOR GREGORY          )
BALLARD and the INDIANAPOLIS     )
CITY-COUNTY COUNCIL,              )
        Defendants.               )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs are bars and taverns (and their owners) located within the Consolidated

City of Indianapolis ("City") and subject to a Smoking Ordinance that prohibits smoking

in their establishments.  A consolidated evidentiary hearing on the Plaintiffs' Motion for

Preliminary and Permanent Injunction was held on October 24 and 25, 2012.  Plaintiffs

request the court to declare that the Smoking Ordinance is unconstitutional and to enjoin

its enforcement.  Being duly advised, the court now enters its Findings of Fact and

Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

**A.      The 2005 Smoking Ordinance**

1.      In 2005, the Consolidated City of Indianapolis and of Marion County (the "City-

      County Council") passed City-County General Ordinance, No. 44, prohibiting

      smoking in places of employment and most buildings accessible to the general

public within the City (the "2005 Smoking Ordinance").  (Hearing Ex. FF, General Ordinance 44, 2005).

2.   The 2005 Smoking Ordinance did not prohibit smoking in all publicly accessible buildings.  Notable exceptions included bars and taverns, "Specialty Tobacco Bars," private clubs, and retail tobacco stores.  (*Id*. at 300-301).

3.   According to the City-County Council, the stated purpose of the law was "to protect the public health and welfare by prohibiting smoking in public places, and places of employment," "to guarantee the right of nonsmokers to breath smoke-free air" and "to recognize that the need to breathe smoke-free air shall have priority over the desire to smoke."  (*Id*. at 298-99).

4.   The City-County Council based the 2005 Smoking Ordinance on the increasing warnings from governmental agencies about the risks of secondhand smoke ("SHS") and upon scientific and epidemiological evidence linking SHS with serious health issues, such as various forms of cancer, cardiovascular disease, and respiratory disease.  (*Id*.).

**B.   The 2012 Smoking Ordinance**

5.   In 2012, the City-County Council amended the Smoking Ordinance (the "Smoking Ordinance" or "2012 Smoking Ordinance").  (Hearing Ex. GG, City-County Council General Ordinance No. 12, 2012.  The 2012 Smoking Ordinance was intended to expand the reach of the 2005 Smoking Ordinance, and was passed without stated findings or intent for the expansion.  (*See generally, id*.).

2

6.      For purposes of this case, the significance of the newly amended 2012 Smoking Ordinance was its inclusion of bars and taverns, and its continued exception for: (1) retail tobacco stores; (2) satellite gaming facilities; (3) private clubs; and (4) tobacco specialty bars.  (*Id*. at 1, 3-5).

7.      A "retail tobacco store" means a store that primarily sells tobacco and tobacco-related products, in which the sale of these items accounts for not less than 85% of the store's gross sales.  (*Id*. at 1).

8.      A "satellite gaming facility" is a facility that, pursuant to Indiana Code § 4-31-5.5, promotes the horse racing industry by permitting wagers on horse races at a satellite facility located within the City.  (*Id*. at 3).

9.      A "private club" is defined as a club that "[p]rovides food or alcoholic beverages only to its bona fide members and guests."  (*Id*. at 3).  To qualify for this exception, a private club must provide notice to the Health and Hospital Corporation of Marion County by September 1, 2012, that through a majority vote of its members, it has elected to allow smoking.  (*Id*.).

10.    A "tobacco specialty bar" is defined in the 2012 Smoking Ordinance to mean a business that, as of January 1, 2012, was licensed to sell alcohol and "where at least twenty percent (20%) or more of its total annual gross income over the preceding calendar year was derived from the on-site sale of cigars or Hookah tobaccos."  (*Id*. at 5).  A "tobacco specialty bar" may not sell cigarettes and may not allow anyone on its premises to smoke cigarettes.  (*Id*.).

3

11.    The amendment was signed by Mayor Ballard on April 19, 2012, and took effect
       June 1, 2012.

**C.    The Plaintiffs**

12.    The individual Plaintiffs claim the 2012 Smoking Ordinance has negatively
       affected their respective bar and tavern businesses.

13.    At the hearing of this matter, Plaintiffs submitted evidence with respect to three
       bars: Road Dog Saloon, owned by Wanda Goodpaster ("Goodpaster") and Tammy
       Jones ("Jones"); Casino Lounge, owned by Rhoda Walker ("Walker"); and
       Maggie's Lounge, owned by Margaret Brady ("Brady").  (Transcript of the
       Preliminary and Permanent Injunction ("Hearing Tr.") at 18, 50, 79).

14.    These bars do not fall within the definition of a "retail tobacco store" or a "tobacco
       specialty bar."  (*Id*. at 19, 51, 65, 79, 91).

15.    Goodpaster described the Road Dog Saloon as a "country bar" catering to the
       "working class."  (*Id*. at 31).  Walker described the Casino Lounge as a "little
       neighborhood bar" that hosts dart leagues and dart tournaments.  (*Id*. at 51, 52, 64).
       Brady described Maggie's bar as a "neighborhood bar" with an Indianapolis Colts'
       theme.  (*Id*. at 79).

16.    Goodpaster estimated ninety percent (90%) of her customers smoke cigarettes;
       Walker estimated that eighty percent (80%) of her customers smoke cigarettes; and
       Brady testified that ninety-seven percent (97%) of her customers smoke cigarettes.
       (*Id*. at 25, 52, 79).

17.  Goodpaster, Jones, Walker, and Brady testified that, since the 2012 Smoking

Ordinance went into effect on June 1, 2012, each of their businesses has suffered

lost profits.  (*Id*. at 23-26, 53-54, 82; Plaintiffs' Exs. 1, 3).   However, none of

these businesses are currently facing insolvency.  (Hearing Tr. at 30, 70, 93).

**D.  The Health Effects of Secondhand Smoke**

18.  Dr. Andrew Hyland ("Dr. Hyland") testified as an expert in epidemiology on

behalf of the City.

19.  Dr. Hyland is chair of the Department of Health Behavior at Roswell Park Cancer

Institute in Buffalo, New York.  (Hearing Tr. at 304).  Dr. Hyland's primary focus

is epidemiological research into the health effects of SHS on the public health.  (*Id*.

at 305-06).

20.  The court determined Dr. Hyland was an expert qualified to give an opinion on the

epidemiological evidence linking SHS to disease in otherwise healthy nonsmokers.

Plaintiffs posed no objection to his testimony.  (*Id*. at 306) (stipulating to Dr.

Hyland's qualifications as an epidemiologist and as an expert in that field).

21.  Epidemiology relies upon examinations of broad populations through

observational studies to draw conclusions about disease and risk factors – in

essence, recording those who are and are not exposed to a particular risk factor and

examining the incidence of particular diseases.  (*Id*. at 313-14).

22.  The two most famous epidemiological studies relating to SHS are the 1986 and the

2006 Surgeon General's Reports.

23.  The 1986 Surgeon General's Report concluded that SHS caused lung cancer in otherwise-healthy nonsmokers.  The Report also concluded that smoking has other negative health effects on nonsmokers, including respiratory disease among children.  (Hearing Ex. NN at 3-4).

24.  The 2006 Surgeon General's Report is the "capstone" or the "definitive piece" on SHS research.  (Hearing Tr. at 326).  The Report relies upon the same studies in the scientific literature as other, prior reports, and includes the most recent information.  (*Id*. at 325).  According to the Report, the three main risks of SHS with an established causal connection to disease in otherwise healthy nonsmokers are: lung cancer, coronary heart disease, and "an array of respiratory conditions in children."  (*Id*. at 327).

25.  Dr. Hyland opined that, based on these findings, no "credible scientist can refute the fact that secondhand smoke is a cause of disease in otherwise healthy nonsmokers and in children."  (*Id*. at 326).

26.  Dr. Hyland further opined that, based upon all of the available epidemiological evidence, "measures to eliminate secondhand smoke exposure would have a differentially large public health impact in a population that has a lot of secondhand smoke exposure now."  (*Id*. at 342).

27.  Epidemiological studies into SHS and its effect on coronary heart disease show that the incidence of coronary events goes down after the implementation of smoke-free laws in a given area.  Dr. Hyland noted a study from Helena, Montana,

6

in which the incidence of acute myocardial infarction went down approximately

40-percent and, when the law was repealed, that coronary event went back to the

baseline level.  (*Id*. at 343).  Although this is just one study, Dr. Hyland testified

that there have been approximately fifteen other studies which establish that

"smoke-free policies save lives."  (*Id*. at 344).

**E.     Economic Impact of the Smoking Ordinance**

28.     The City presented evidence on the economic impact of the Smoking Ordinance on

health care costs in Marion County through the expert testimony of Dr. Terrell

Zollinger ("Dr. Zollinger"), a professor of epidemiology at Indiana University's

Richard M. Fairbanks School of Public Health, and two reports and a peer-

reviewed article co-authored by him.  (*See* Hearing Exs. KK, LL, MM).  The court

found him qualified by education and experience to give an opinion on that topic.

Plaintiffs did not pose an objection to his testimony.  (Hearing Tr. at 254).

29.     Through Dr. Zollinger's testimony and the exhibits introduced into evidence as

Hearing Exhibits KK, LL, and MM, the City established that the healthcare costs

and loss-of-life costs in Marion County due to disease and death attributable to

SHS in 2002 were $56.2 million.  (Hearing Ex. KK at 21; Hearing Tr. at 267).  The

conclusions of that study were published in a peer-reviewed article in the

American Journal of Health Promotion.  (Hearing Ex. LL; Hearing Tr. at 268).

30.     The City also established that in 2010, healthcare costs and loss-of-life costs in

Marion County attributable to SHS were $195.3 million.  (Hearing Ex. MM at 3;

Hearing Tr. at 273).

31.   Dr. Zollinger explained that the considerable increase in health care costs between 2002 and 2010 was due to a number of factors, including higher relative risks based upon new information, relative risks of newly associated diseases, the increased costs of healthcare, and the increased monetary value on "the value of a human life." (Hearing Tr. at 272).

32.   He also testified that the increased costs of healthcare and loss of life are borne by the public generally through a ripple effect in the economy: (1) health insurance premiums rise to keep up with the cost of healthcare; (2) as businesses absorb rising healthcare premiums and the loss of productive employees, those businesses pass those additional costs on to the consumer through price increases on their goods and services; and (3) the healthcare costs for the uninsured are passed on to the taxpayer. (*Id*. at 274-75).

33.   The City also presented evidence on the economic impact of the Smoking Ordinance on the City's convention business, VisitIndy, through the testimony of VisitIndy representative, Chris Gahl ("Gahl").

34.   Gahl testified that tourism and conventions attract nearly twenty million visitors to the City each year, generating an economic impact of $3.5 billion. (*Id*. at 418). He also testified that tourism and hospitality in the City employs approximately 69,501 persons. (*Id*. at 427).

35.   As committee hearings on a prospective amendment to the 2005 Smoking

Ordinance took place, VisitIndy took an official position by board resolution in November, 2011, supporting passage of a more stringent Smoking Ordinance.  (*Id.* at 420-21).

36.     According to Gahl, VisitIndy's support stemmed from the fact that many conventions and/or events require that a prospective host city have a comprehensive smoking ordinance in order to be considered as a host city.  (*Id.* at 442).

37.     In addition, the City has invested millions of dollars upgrading its convention infrastructure in an already extremely competitive industry.  (*Id.* at 421-22).  The existence of a stronger smoking ordinance allows the City to compete with the "upper echelon" of convention cities, such as Chicago, Orlando, Austin, and San Antonio.  (*Id.* at 421).

**F.     Dr. Dunn**

38.     Plaintiffs named Dr. John Dunn ("Dr. Dunn") as an expert to refute the epidemiological studies relied upon by the City.

39.     Dr. Dunn is not an expert in epidemiology.  (Hearing Tr. at 145-57).

40.     Dr. Dunn's testimony was a recitation of his own political beliefs regarding SHS, and was not credible.  (*See, e.g.,* Hearing Tr. at 187 (Q: Okay.  So you said – repeatedly in that statement you characterized everyone that opposes secondhand smoke or that supports the smoking ordinance, for whatever reason, as the "High Church of Holy Smoke Haters?" A: . . . I said it then, and I'd say it today if you

want me to.").

41.     At the hearing, the court questioned Dr. Dunn about his "expert report."  (Hearing

Tr. at 217-223).

42.     The document submitted by Plaintiffs' counsel as Dr. Dunn's expert report was

entitled, "Dr. Dunn's Report to the Ohio Legislature." (*See* Plaintiffs' Reply in

Support of Motion for Preliminary Injunction and in Response to Defendants' First

Motion to Dismiss, Ex. 5).  Dr. Dunn admitted that: (1) the report was not meant as

an expert report for purposes of this case; (2) it was directed at the Ohio

Legislature to persuade it not to pass anti-smoking legislation; and (3) he

"wouldn't have submitted that as an expert opinion to the court."  (*Id*. at 220).

43.     Dr. Dunn's testimony is hereby stricken.

## CONCLUSIONS OF LAW

1.     To the extent any of the foregoing findings of fact is a conclusion of law, it is

hereby adopted as a conclusion of law.  To the extent any of the conclusions of law

set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2.     The court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1331, 1343, and

1367.

**A.     Standard of Review**

3.     Plaintiffs have requested a preliminary and permanent injunction of the 2012

Smoking Ordinance.

4.     A preliminary injunction is analyzed "in two distinct phases: a threshold phase and

a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).

5.     Under the threshold phase for preliminary injunctive relief, a plaintiff must establish – and has the ultimate burden of proving by a preponderance of the evidence – each of the following elements: (1) that it has a reasonable likelihood of success on the merits of the underlying claim; (2) that it will suffer irreparable harm in the interim period prior to final resolution of its claim if the preliminary injunction is denied; and (3) that traditional legal remedies would be inadequate. *Id*. at 1086.

6.     A permanent injunction "is not provisional in nature, but rather is a final judgment." *Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996).  Thus, rather than show a reasonable likelihood of success on the merits, the plaintiff must show actual success on the merits.  *Id*. (noting that the relevant inquiry is "whether [the plaintiff] has *in fact* succeeded on the merits"). As with a preliminary injunction, a plaintiff must prove actual success on the merits by a preponderance of the evidence.  *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008).

7.     "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Girl Scouts*, 549 F.3d at 1086  (citation omitted).  If, however, the court determines the moving party has satisfied the threshold phase, the court then proceeds to the balancing

phase of the analysis.  *Id.*

8.   The balancing phase requires the court to balance the harm to the moving party if the injunction is denied against the harm to the nonmoving party if the injunction is granted.  *Id.*  In so doing, the court utilizes what is known as the sliding scale approach; "the more likely the [movant] will succeed on the merits, the less the balance of irreparable harms need favor the [movant's] position."  *Id.*

**B.   Success on the Merits**

9.   Plaintiffs allege that the Smoking Ordinance: (1) violates their rights to due process of law under the Fourteenth Amendment of the United States Constitution and Article 1, Section 21 of the Indiana Constitution; (2) violates their right to freedom of association under the First Amendment of the United States Constitution and Article 1, Section 9 of the Indiana Constitution; (3) violates their right to equal protection under the Fourteenth Amendment of the United States Constitution;  (4) constitutes a taking of property in violation of the Fifth Amendment of the United States Constitution and Article 1, Section 23 of the Indiana Constitution; (5) violates the Ninth Amendment of the United States Constitution; and (6) violates the privileges and immunities clause of the Indiana Constitution under Article 1, Section 23 of the Indiana Constitution.

10.   Plaintiffs' federal constitutional claims are brought under 42 U.S.C. § 1983. That section provides a private cause of action against a person, who acting under color of state law, deprives an individual of any "rights, privileges, or immunities

secured by the Constitution and laws" of the United States.  *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983).

11.  To prevail on a Section 1983 claim, a plaintiff must show that he or she suffered the violation of a federal constitutional right by one acting under color of state law. *Id*.

12.  The court now turns to the merits of Plaintiffs' federal and state constitutional claims.

**1.  Claims under the United States Constitution**

**a.  Due Process**

13.  The Due Process Clause of the Fourteenth Amendment provides both substantive and procedural due process rights.  *United States v. Salerno*, 481 U.S. 739, 746 (1987).

14.  Plaintiffs' Fourteenth Amendment challenge is brought under the substantive component of the Due Process Clause, which prohibits a state from violating a fundamental right.  Laws that abridge fundamental rights are subject to strict scrutiny.  *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (2000).

15.  Fundamental rights and liberties are "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations and quotations omitted).  "The protections of substantive due process have been conferred primarily upon matters

relating to marriage, family, procreation, and the right to bodily integrity." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997).

16.   Although smoking tobacco may arguably be part of the Nation's history, both circuit and district courts around the country consistently find that cigarette smoking is not a fundamental right.  *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017-18 (8th Cir. 2012); *Steele v. County of Beltrami*, 238 Fed.Appx. 180, 181 (8th Cir. 2007) (collecting cases); *Grusendorf v. City of Oklahoma City*, 816 F.2d 539, 541-42 (10th Cir. 1987); *American Legion Post # 149 v. Washington State Dep't of Health*, 192 P.3d 306, 322-23 (Wash. 2008) (collecting cases); *Batte-Holmgren v. Comm'r of Pub. Health*, 914 A.2d 996, 1008 (Conn. 2007); *Players, Inc. v. City of New York*, 371 F.Supp.2d 522, 542 (S.D.N.Y. 2005); *City of North Miami v. Kurtz*, 653 So.2d 1025, 1028 (Fla. 1995).

17.   Similarly, courts have rejected the right to use one's business premises to allow smoking as a fundamental right.  *See Coalition for Equal Rights v. Owens*, 458 F.Supp.2d 1251, 1263 (D. Col. 2006) (finding state statutory ban on indoor smoking did not infringe business owners' fundamental right to use property as owner wished; instead, the right to use one's business premises was subject to the proper exercise of the government's police power); *Castaways Blackwater Café, Inc. v. Marstiller*, 2006 WL 2474034, at *4 (M.D. Fla. 2006) (rejecting the asserted right to allow patrons to smoke in public restaurants as a fundamental right, explaining that "[w]hile tobacco smoking may have a long history, both

liberty and justice will continue to exist if smoking in a public restaurant is curtailed or precluded").

18. In the absence of a fundamental right, Plaintiffs' due process claims are subject to the rational basis test. *Turner v. Glickman*, 207 F.3d 419, 424 (7th Cir. 2000). Under this standard, an ordinance – like any other piece of legislation enacted pursuant to a proper delegation of power – carries a "strong presumption of validity." *FCC v. Beach Commc'ns.*, 508 U.S. 307, 314-15 (1993); *City of Indianapolis v. Clint's Wrecker Serv., Inc.*, 440 N.E.2d 737, 740 (Ind. Ct. App. 1982) ("Local ordinances enacted pursuant to a proper delegation of power stand on the same footing as acts of the legislature" and are "presumptively constitutional until clearly proven otherwise.").

19. The 2012 Smoking Ordinance must be upheld if it is rationally related to a legitimate governmental interest. *Greater Chicago Combine & Ctr., Inc. v. City of Chicago*, 431 F.3d 1065, 1071-72 (7th Cir. 2005) (noting that "governmental action passes the rational basis test if a sound reason may be hypothesized") (quoting *Pro-Eco., Inc. v. Bd. of Comm'rs of Jay County*, 57 F.3d 505, 514 (7th Cir. 1995))); *Turner*, 207 F.3d at 426 (stating that in the absence of a fundamental right, "substantive due process requires only that the statutory imposition not be completely arbitrary and lacking any rational connection to a legitimate government interest").

20. "The burden is on the one attacking the legislative arrangement to negative every

conceivable basis which might support it, whether or not the basis has a foundation

in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320-21 (1993) (internal

citation and quotation marks omitted).

### 1.     Public Health and Safety

21.   The City contends that the 2012 Smoking Ordinance is rationally related to the

       goal of protecting the public health and safety.

22.   Governmental studies, including the 1986 and 2006 Surgeon General's Reports,

       reflect that there is a causal link between an individual's exposure to SHS and

       disease, including cardiovascular disease, respiratory disease, and various forms of

       cancer.  The relevance and reliability of these studies was further established by

       the City's expert, Dr. Hyland, whose testimony was credible and highly

       informative.

23.   Notwithstanding the City's evidence in this regard, Plaintiffs respond that the

       City's 2012 Smoking Ordinance is not supported by a rational basis because the

       epidemiological evidence that the City and its experts relied upon does not pass the

       reliability standard established in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

       579 (1993).  For example, Plaintiffs attack a 1999 study conducted by the National

       Cancer Institute indicating that SHS was responsible for more than 38,000 deaths

       in the United States annually, and a finding by the Public Health Service's

       National Toxicology Program that SHS is a "known human carcinogen."  (*See*

       Hearing Ex. FF at 298, Findings (a) and (b)).  The National Cancer Institute's

16

study and the finding by the Public Health Service's National Toxicology Program were cited in the 2005 Ordinance's Findings and Intent Section 616-101.  (*Id.*).

24. Plaintiffs' *Daubert* challenge to the reliability of the epidemiological evidence cited by the City in support of the 2012 Ordinance is misplaced.  *Daubert* has no place in legislative fact-finding because the City is not obligated to prove the correctness of its legislative judgment.  *G.M. Enterprises, Inc. v. Town of St. Joseph, Wis.*, 350 F.3d 631, 640 (7th Cir. 2003) ("A requirement of *Daubert*-quality evidence would impose an unreasonable burden on the legislative process . . .").  Indeed, "'legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Heller*, 509 U.S. at 319 (citing *Beach Commc'ns*, 508 U.S. at 315).

25. The City's 2012 Smoking Ordinance is rationally justified by the many governmental studies linking SHS to a number of serious health issues, including cancer, cardiovascular disease, and respiratory disease.  Accordingly, there is a rational basis to conclude that the Smoking Ordinance protects all people – owners, employees, and patrons alike – from the harm of SHS.

## 2.    Economic Impact

26. The City also presented evidence on the economic impact of the 2012 Smoking Ordinance.  Like the health and safety effects, this was a rational basis specifically presented to the City-County Council by at least one of the Councillors, Benjamin Hunter, who supported the 2012 Smoking Ordinance.  (Hearing Tr. at 231-33).

17

27.   Dr. Zollinger testified that the healthcare costs associated with treating diseases and deaths associated with SHS are in the millions of dollars – $56.2 million in 2002 and $195.3 million in 2010.  (Hearing Ex. KK at 21; Hearing Ex. MM at 3; Hearing Tr. at 267, 273).

28.   As a result, the City could reasonably conclude that the economic impact of treating disease and death related to SHS was a rational basis.

29.   In addition, the City established that it has already invested millions of dollars in upgrading its convention infrastructure in an already extremely competitive market.  (Hearing Tr. at 421-22).

30.   Gahl testified that because many host cities require a comprehensive smoking ordinance to be considered for an award, the existence of a tougher smoking ordinance makes the City more competitive for upper tier convention business. (*Id*. at 421-22).

31.   As a result, the City could rationally conclude that the 2012 Smoking Ordinance could potentially bring millions of dollars in new convention business and tourism money as the City competes for business it previously could not win.

### 3.   Nuisance

32.   Lastly, the City presented evidence that SHS is considered by many to be a nuisance.

33.   SHS is a particulate that can be seen in the air and that reduces air quality.  SHS also has a strong odor that many people find unpleasant.  As a result, many people

18

would prefer not to patronize establishments due to the presence and odor of SHS. (*Id*. at 71, 119, 134-35, 241).

34. The nuisance effect of SHS is a rational basis supporting the constitutionality of the 2012 Smoking Ordinance.

35. The court finds the 2012 Smoking Ordinance does not violate the Due Process Clause because it is rationally related to three government interests: (1) to protect the health and safety of the general public, (2) to impact the City's economy in a positive manner through healthcare and tourism, and (3) to abate SHS's nuisance effect.

    **b.**  **Freedom of Association**

36. Freedom of association is a right protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).

37. The freedom of association protects: (1) "certain intimate relationships" that "safeguard[] the individual freedom that is central to our constitutional scheme" and (2) the "right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id*.

38. The types of "intimate relationships" entitled to constitutional protection include "those that attend the creation and sustenance of a family – marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Id*. at

619-20 (internal citations omitted).  These types of relationships share "such attributes as relative smallness, a high degree of selectivity in decisions to being and maintain the affiliation, and seclusion from others in critical aspects of the relationship."  *Id.* at 620.

39.     Plaintiffs argue that, because of the 2012 Smoking Ordinance, they have "lost the liberty interest of being able to operate their privately-owned businesses for clientele who choose to either smoke or choose to associate with others who smoke."  (Plaintiff's Proposed Findings of Fact and Conclusions of Law # 203).  In addition, "[o]thers have lost the ability to choose to congregate in those establishments and associate with others of like mind and habits."  (*Id.*).

40.     Plaintiffs have not established that a relationship with smoking clientele and/or other smokers is of sufficient selectivity or size to be the type of intimate relationship worthy of constitutional protection.  Simply describing the Plaintiff bars as "small, neighborhood bars" does not satisfy those elements.

41.     In addition, Plaintiffs have not established that the 2012 Smoking Ordinance regulates a "relationship."  In fact, it does not.  Instead, it regulates conduct by prohibiting those who smoke cigarettes from smoking inside bars or taverns located within Marion County.  *See Fraternal Order of Eagles v. City & Borough of Juneau*, 254 P.3d 348, 355 (Ala. 2011) (rejecting a challenge to the city's and borough's ordinance prohibiting smoking in private clubs, holding that "the First Amendment protects the ability to choose one's intimate associates freely, not the

20

ability to engage in any conduct in any place so long as one is interacting with his or her intimate associates").

42.   Thus, there is no basis for concluding that Plaintiffs' or their patrons' rights of intimate association are infringed by the 2012 Smoking Ordinance.  *See Players, Inc. v. City of New York*, 371 F.Supp.2d 522, 545 (S.D.N.Y. 2005) ("It is difficult to see how the social intercourse, and social intimacy, that the club seeks to facilitate could be unconstitutionally infringed merely because the meeting place provided by the club can no longer allow indoor smoking . . . ."); *Am. Lithuanian Naturalization Club v. Bd. of Health of Athol*, 844 N.E.2d 231, 242 (Mass. 2006) ("There has been no showing that enforcement of the town [smoking ban on private clubs] will infringe the members' right to maintain relationships"); *Fraternal Order of Eagles*, 254 P.3d at 352-55 (City's smoking ban within private clubs serving food or beverages "did not regulate or interfere with the members' choices to enter into and maintain those relationships").

###        c.        Equal Protection

43.   The analysis of Plaintiffs' equal protection claim requires the court to determine the classification of the group in question so as to determine the appropriate level of judicial scrutiny.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

44.   Because the classification at issue in this case – bar and tavern owners who wish to allow smoking on their premises – does not implicate a suspect class, Plaintiffs'

equal protection claims are subject to rational basis review.  Thus, the 2012
Smoking Ordinance must be upheld "if there is any reasonably conceivable state of
facts that could provide a rational basis for the classification."  *Beach Commc'ns,*
508 U.S. at 313.

45.    As established above, the 2012 Smoking Ordinance bears a rational relationship to
three state interests – to protect the health and safety of the general public, to abate
the nuisance generally, and to impact the City's economy in a positive manner
through healthcare and tourism.

46.    Plaintiffs argue that the exception for "tobacco specialty bars," such as cigar bars
and hookah bars, has no rational basis for furthering the purposes of the 2012
Smoking Ordinance and constitutes an arbitrary and capricious classification of
properties and establishments.  This is because, argue Plaintiffs, cigar smoking
produces SHS just as cigarette smoking does; thus, the City's exemption for cigar
bars and hookah bars is simply irrational.

47.    Legislative classifications do not violate the Equal Protection Clause merely
because they are, to some degree, overinclusive or underinclusive.  *New York City
Transit Auth. v. Beazer*, 440 U.S. 568, 593 n.39 (1979);  *Lamers Dairy, Inc. v. U.S.
Dep't of Agr.*, 379 F.3d 466, 475 (7th Cir. 2004) (noting that "'[m]ere
underinclusiveness is not fatal to the validity of a law'" under the Equal Protection
Clause) (quoting *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679
(9th Cir. 2002)));  *Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir. 1997) (noting that

under rational basis review, "the classification need not be the most narrowly tailored means available to achieve the desired end").

48. Moreover, a legislature is not required to "'strike all evils at the same time or in the same way,'" and it also "'may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (citations omitted).

49. Here, the City's Smoking Ordinance has been a step-by-step process. The City's original 2005 Smoking Ordinance prohibited smoking in a number of buildings accessible to the general public, but did not include bars and taverns. In 2012, the City took the next step by eliminating a number of exceptions, including the bars and taverns at issue here. This is permissible. The City "could rationally have decided" that eliminating the exemption for bars and taverns might improve the public health. *Id.*

50. In a similar vein, Plaintiffs maintain that the ban on cigarette smoking, but not cigar smoking, in cigar bars is irrational.

51. "A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Heller*, 509 U.S. at 321 (internal quotation marks and citations omitted). "The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific." *Id.* (internal quotation

marks and citation omitted).

52.  The City could have rationally determined that eliminating some, but not all smoking in cigar bars, reduces the amount of SHS present indoors.

53.  Further, there is a rational basis for each exception in the 2012 Smoking Ordinance.

54.  "Tobacco specialty bars" and "retail tobacco stores," unlike Plaintiffs' bars and taverns, specialize in tobacco products.  To qualify for the exception, they must meet established regulatory criteria.  "Tobacco specialty bars" must prove that tobacco sales account for 20% of their gross sales, and "retail tobacco stores" must prove that tobacco accounts for 85% of their gross sales.  (Hearing Ex. GG at 1-2, 4-5).

55.  The City could have rationally drawn a distinction between businesses that specialize in the sale of tobacco products, and bars and other public establishments.

56.  The exception for "private clubs" is consistent with a rational basis of protecting the health and safety of the public, while allowing private clubs to remain private.

57.  To qualify for the exception, the 2012 Smoking Ordinance requires private clubs to determine by majority vote prior to September 1, 2012, whether the club will allow smoking.  (Hearing Ex. GG at 3).  Some of the private clubs have voted to be smoke free.  (Hearing Tr. at 234).

58.  In addition, the exception for private clubs applies only to clubs in existence prior

to September 2012.  Thus, the 2012 Smoking Ordinance will, over time, restrict

smoking in new, private clubs.

59.     The City could have rationally drawn a distinction between private clubs, and bars

and taverns that admit the general public.  *See, e.g., Knight v. City of Tupelo*, 2006

WL 3741879, at *5 (N.D. Miss. 2006) (holding that the exception for private clubs

was consistent with the smoking ordinance's intent of protecting public health).

60.     Next, Plaintiffs challenge the exception for satellite gaming facilities.

61.     The City has a legitimate interest in obtaining the tax revenue generated from such

facilities. Plaintiffs provide no authority that the City's consideration of the

economic benefit derived from these gaming establishments is improper under

rational basis review.  The fact that the City's distinction between satellite gaming

facilities and bars may not seem fair does not render the 2012 Smoking Ordinance

unconstitutional.

62.     The City could have rationally drawn a distinction between off-track betting

facilities and bars and taverns.

63.     Lastly, to the extent Plaintiffs maintain that the classifications drawn by the City

do not seem fair or just, it warrants repeating that a classification does not fail

rational-basis review because it results in some inequality or results to the

disadvantage of a specific group.  *Beach Commc'ns*, 508 U.S. at 315-16.

"Defining the class of persons subject to a regulatory requirement – much like

classifying governmental beneficiaries – 'inevitably requires that some persons

25

who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'" *Id.* (quoting *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 116, 179 (1980)).

64. Accordingly, the City's 2012 Smoking Ordinance passes the rational basis test, and, therefore, the Plaintiffs' equal protection challenge cannot succeed on the merits.

### d.     Fifth Amendment Takings Claim

65. Governmental takings under the Fifth Amendment may be regulatory or physical. Since Plaintiffs' bars and taverns have not physically been taken, their claims fall under the rubric of a regulatory taking.

66. A regulatory taking occurs when a regulation denies a landowner "all economically beneficial or productive use of land." *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1015-16 (1992) (citation omitted).

67. Plaintiffs claim that the 2012 Smoking Ordinance constitutes a regulatory taking because, since its enactment, Plaintiffs have lost business.

68. The fact that their businesses have suffered from an economic standpoint, while unfortunate, does not establish that they have lost "all economically beneficial use" of their property.  Therefore, Plaintiffs' takings claim cannot succeed on the merits.

26

### e.   Ninth Amendment

69.   The Ninth Amendment provides that the "enumeration in the Constitution, of

certain rights, shall not be construed to deny or disparage others retained by the

people."  U.S. Const. amend. IX.

70.   The Ninth Amendment has never been incorporated through the Fourteenth

Amendment, and thus, it is not applicable to municipalities like the City.  *Griswold*

*v. Connecticut*, 381 U.S. 479, 492-93 (1965); *Minority Police Officers Ass'n of*

*South Bend v. City of South Bend*, 555 F.Supp. 921, 926-27 (N.D. Ind. 1983), *aff'd*

*in part, appeal dismissed in part*, 721 F.2d 197 (7th Cir. 1983).

71.   Moreover, the Ninth Amendment is not a source of substantive rights.  *Griswold*,

381 U.S. at 492.  Instead, it "simply shows the intent of the Constitution's authors

that other fundamental personal rights should not be denied such protection or

disparaged in any other way simply because they are not specifically listed in the

first eight constitutional amendments."  *Id*.

72.   For these reasons, to the extent Plaintiffs bring a claim under the Ninth

Amendment, the claim cannot succeed on the merits.

### 2.   Claims Under the Indiana Constitution

73.   Now that the Plaintiffs' federal claims are dismissed, the court must evaluate

whether to exercise supplemental jurisdiction over their state law claims.  *See* 28

U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental

jurisdiction over a claim . . . if . . . the district court has dismissed all claims over

27

which it has original jurisdiction . . . ."); *Calsbad Tech., Inc. v. HIF BIO, Inc.*, 556

U.S. 635, 640 (2009) ("Upon dismissal of the federal claim, the District Court

retained its statutory supplemental jurisdiction over the state-law claims.  Its

decision declining to exercise [that] was not based on a jurisdictional defect but on

its discretionary choice not to hear the claims despite its subject-matter jurisdiction

over them.").

74.    When deciding whether to exercise supplemental jurisdiction, "'a federal court

should consider and weigh in each case, and at every stage of the litigation, the

values of judicial economy, convenience, fairness, and comity.'" *City of Chicago*

*v. Int'l Coll. of Surgeons*, 522 U.S. 156, 158 (1997).

75.    The parties extensively briefed, and the court held an evidentiary hearing with

respect to, the federal and state constitutional claims raised by the Plaintiffs.  The

court finds that the values of judicial economy, convenience, and fairness are

easily satisfied.  Moreover, given that the Plaintiffs' state constitutional claims

cannot survive on the merits for the reasons set forth below, the value of federal-

state comity is not served.  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 502 (7th Cir.

1999) ("[F]ederal-state comity is certainly not served by sending back to state

court 'doomed litigation' that will only be dismissed once it gets there.") (citations

omitted).

76.    The court now turns to the merits of their state law claims.  In Plaintiffs' Amended

Complaint, they raise four claims under the Indiana Constitution.  They allege : (1)

28

a violation of the privileges and immunities clause under Article 1, Section 23; (2) a violation of their due process rights under Article 1, Section 21; (3) a violation of their freedom to associate under Article 1, Section 9; and (4) an unconstitutional taking of their property under Article 1, Section 23.

77. Indiana "has no statutory provision comparable to 42 U.S.C. § 1983 creating an explicit civil remedy for constitutional violations by either individual officers or governmental entities."  *Cantrell v. Morris*, 849 N.E.2d 488, 493 (Ind 2006). Thus, Indiana courts hold that the Indiana Constitution does not create a private right of action for damages when existing tort law amply protects the right guaranteed by the Indiana Constitution.  *Id.* at 506-07.

78. Here, Plaintiffs do not seek money damages; they seek to enjoin the City from enforcing the 2012 Smoking Ordinance.

79. The law is not clear as to whether the Indiana Constitution creates a private right of action in this context.

80. To the extent the court may properly rule on Plaintiffs' state constitutional claims, Plaintiffs' claims would not prevail.

81. Plaintiffs did not present any evidence or argument in support of claims numbered (2) - (4) above at the evidentiary hearing of this matter, nor in their Proposed Findings of Fact and Conclusions of Law.

82. The court therefore finds that Plaintiffs waived their claims for: (1) a violation of their due process rights under Article 1, Section 21; (2) a violation of their freedom

to associate under Article 1, Section 9; and (3) an unconstitutional taking of their property under Article 1, Section 23.

83.    In addition, Plaintiffs' claim brought under Article 1, Section 23's privileges and immunities clause, cannot survive on the merits.

84.    In *Collins v. Day*, the Indiana Supreme Court interpreted Article 1, Section 23 as imposing two requirements.  644 N.E.2d 72, 78-79 (Ind. 1994).  First, the disparate treatment accorded by the legislation must be reasonably related to the inherent characteristics that distinguish the unequally treated classes.  Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.  *Id*.

85.    In assessing the constitutionality of a piece of legislation, the court "must accord considerable deference to the manner in which the legislature has balanced the competing interests involved."  *Id*. at 79-80 (citation omitted). "'Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable.  So long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature . . . .'"  *Id*. at 80 (quoting *Chaffin v. Nicosia*, 310 N.E.2d 867, 869 (Ind. 1974)).

86.    As with a challenge under the United States Constitution, the party challenging the constitutionality of an ordinance under the Indiana Constitution has the burden to negate "every conceivable basis which might have supported the classification."

30

*Id.* at 80 (internal quotation and citation omitted).

87.   In *Morrison v. Sadler*, the Indiana Court of Appeals stated that "[t]he practical

effect of *Collins* and cases following it is that statutes will survive Article 1, § 23

scrutiny if they pass the most basic rational relationship test."  821 N.E.2d 15, 22

(Ind. Ct. App. 2005).

88.   Plaintiffs' challenge is premised on the exception for "tobacco specialty bars."

Specifically, Plaintiffs argue that the exception for cigar bars and hookah bars does

not further the purpose of the 2012 Smoking Ordinance, as both cigar smoke and

hookah smoke, like cigarette smoke, produce SHS.  For the reasons previously

articulated by the court, the City could have rationally found that the distinction

between bars and taverns and Tobacco specialty bars furthers the legitimate

government interest of reducing the public's exposure to SHS.  (*See* Conclusions

of Law ## 49, 52).

89.   In addition, as stated previously, the City could have rationally made a distinction

between Plaintiffs' bars and taverns and "tobacco specialty bars" based upon the

fact that tobacco specialty bars specialize in the sale of tobacco, and must prove

that sales of tobacco meet regulatory requirements.  (*See* Conclusions of Law ##

54-55).

90.   Plaintiff's claims under the Indiana Constitution cannot succeed on the merits.  In

addition, for the reasons set forth previously, Plaintiff's claims under the United

States Constitution cannot succeed on the merits.

31

**C.      Irreparable Harm**

91.    Irreparable harm implies that the plaintiff has no adequate remedy at law, and that

the harm "cannot be prevented or fully rectified by the final judgment after trial."

*Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (1986).  The

possible insolvency of a plaintiff's business is enough to constitute irreparable

harm.  *Id*.

92.    There is no evidence that the bars and taverns at issue are facing insolvency.

(Hearing Tr. at 30, 70, 93).  At most, the bars and taverns have suffered lost

profits.

93.    The court therefore finds that Plaintiffs have not established irreparable harm.

**D.      Balancing the Harms**

94.    When balancing the harms, the court "weighs the irreparable harm that the moving

party would endure without the protection of the preliminary injunction against

any irreparable harm the nonmoving party would suffer if the court were to grant

the requested relief."  *Girl Scouts*, 549 F.3d at 1086.  In so doing, the court uses a

sliding-scale approach: the less likely the plaintiff is to win on the merits, the more

harm the plaintiff must show, and visa-versa.  *Id*.  In balancing the harm, the court

also considers the public interest.  *Id*.

95.    An evaluation of these factors leads to the conclusion that, because the Plaintiffs

cannot succeed on the merits, the harm the Plaintiffs will face if the preliminary

and permanent injunction is granted is greatly outweighed by the harm to the City

if the injunctions are not granted.

96.     Moreover, granting the Plaintiffs' relief in this case would harm the public interest

because nonsmokers who live and work in the City would face more exposure to

SHS.

97.     Accordingly, Plaintiffs are not entitled to a preliminary or permanent injunction.

## CONCLUSION

Plaintiffs have not established actual success on the merits of their claims.  The

2012 Smoking Ordinance advances the public interest, and the legislative choice to

include bars and taverns is constitutionally sound.  Even if Plaintiffs could succeed on the

merits, Plaintiffs have not established that the balance of harms weighs in their favor.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that

Plaintiffs' Motion for a Preliminary and Permanent Injunction is **DENIED** and that

judgment on the merits shall issue in favor of the Defendants and against the Plaintiffs.

**SO ORDERED** this  6th   day of March 2013.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.